17  353
175  307

# McMichael *versus* McDermott.

1. The policy of the law, as well as the Act of Assembly, requires, that sheriff's sales of personal property be public; and the 42d section of the Act of 10th June, 1836, relative to executions, requires that before any sale of personal property be made, the sheriff shall give notice thereof, "during at least six days, by not fewer than six handbills;" and when there was no bidder present but the plaintiff in the execution, and no bystanders, it was incumbent on him to inquire whether the requisite notice had been given, and a sale to him, made under such circumstances, no such notice of the sale having been given, was fraudulent and void.

2. Where a question of fraud is trying, and there is evidence of fraudulent conduct on the part of the plaintiff, the court should not decide it, but should submit the question of fraud to the jury.

3. Records of judgments against the party whose property the plaintiff purchased at sheriff's sale, one of them obtained before the sale, and others soon after it, are evidence to show the existence of creditors who might be injured by the sheriff's sale, and should have been received.

4. Where the sheriff is sued for selling the same personal property a second time on another execution, it is not an objection to an examination of fraud alleged to exist in the first sale by the sheriff that *he* is estopped from giving evidence of fraud: the sheriff is but the instrument of the law in making the sale, and the execution creditor of the defendant who had the property sold at the second sale may take defence in the suit, and show, if he can, that the first sale was collusive.

ERROR to the District Court, *Philadelphia.*

McDermott brought an action of trespass, in the District Court for the city and county of Philadelphia, against McMichael, the sheriff of Philadelphia county, and Alsop, for seizing and selling his goods as those of Edmund Laguerenne, on the 26th of February, 1845, at the residence of Laguerenne, near Germantown, under a writ of *fieri facias* issued out of said court, at the suit of Quervelle, who had obtained a judgment thereon against said Laguerenne, on the 24th of December, 1844, for $273.80. To prove his property in the goods so seized and sold, McDermott gave in evidence a judgment in the said court confessed to him by Laguerenne on the 11th September, 1844, on bond and warrant of attorney, dated that day, in the sum of $8200, conditioned for the payment of $4100 immediately; a *fieri facias* issued thereon, and a sale by Killion, a deputy of McMichael, then sheriff of Philadelphia county, of a number of articles, the personal property of Laguerenne, on the 26th of September, 1844, at Laguerenne's residence near Germantown, among which were the articles, for seizing and selling which this action was brought, including all the articles of household furniture bought by Laguerenne from Quervelle, for the price of which Quervelle's said judgment was obtained. This sale on the judgment of McDermott, and the proceedings at that sale, were proved, on the part of the plaintiff, by Killion, who testified as follows:—

"I was in the sheriff's office in 1844; Mr. McMichael was. sheriff; I was his deputy. I remember the sale of Laguerenne's personal property. I sold his personal property. I signed the return." The witness being shown a bill of sale, further testified:—'

"The handwriting of the body is my brother's—he clerked the sale for me. The receipt and the heading is in my handwriting. The plaintiff purchased the property at that sale."

The bill and receipt was then read.

Being cross-examined by the counsel of Anthony G. Quervelle, who took defence in this action, the witness said:—

"The sale took place at Laguerenne's residence, near Mount Airy, two or three miles from Germantown. It took place in the morning. *The plaintiff was present,* and the two Mr. Killions. Three, four, or five that I don't know, besides the clerk. Two or three of them were women, one of them Miss McDermott. The sale was directed a week before, and did not take place. The sheriff keeps a book of sales of personal property."

A notice, dated February 21, 1845, from McDermott, by his attorney, was served upon the deputy of the sheriff. It was stated in it that the property levied on belonged to McDermott, and unless it were released, the sheriff would be held responsible for damages.

On the part of Quervelle, it was contended that the sale under the execution of McDermott was fraudulently and secretly conducted by the management of the plaintiff McDermott, who was Laguerenne's brother-in-law; that no advertisements of the sale were put anywhere; that though near to a village it was not known there; to the servants of the family it became known on the day of sale; that no one but the defendant and his family, except the plaintiff, and Killion, and his brother who was the clerk, were present; that no bell was rung, as usual, to call in purchasers, and that no one bid or purchased but the plaintiff, who was present during the whole sale, and who left the articles in Laguerenne's possession. That at the sale under the writ of *Quervelle,* there was a good attendance, and it was generally known, from being advertised in the handbills put up in the neighborhood, stating it to be Laguerenne's property, and the ringing of the bell. Mary Scantling was examined on the trial. She testified, *inter alia,* that she lived at Laguerenne's at the time of the first sale. There were several present—she knew McDermott, Mr. Laguerenne and family, but not the rest—she recollected of no advertisement being put up. That she did not hear any bell. That she first heard that there was to be a sale, on the night before it took place— that she heard them selling the goods, and heard Mr. McDermott's name cried out several times—did not hear the name of any other . person called out. The defendants further offered to show *the in-*

*debtedness of Laguerenne,* by the production of actions and judgments against him, and his liability to immediate execution at the suit of Leger, whose judgment was postponed for three months by the return of Killion to the first writ issued against Laguerenne; but this evidence was rejected. The right to call Killion and to use him to rebut the defendant's case, was also ruled in favor of the plaintiff by the judge.

On the part of McDermott it was alleged that the handbills for the first sale were printed and delivered to the poster employed in the sheriff's office: it was not, however, proved that they were put up.

The counsel for the *plaintiff* (the defendants having closed their case) offered rebutting testimony to show that plaintiff gave express directions to make the money; that it was not customary to insert the name of the defendant in sheriff's advertisements of personal property; and called John Killion, who was objected to by the counsel for defendants, as interested, having given bond to McMichael, one of the defendants, for the proper and faithful performance of his duty as deputy sheriff, and the said Killion stating to the court that he had given such a bond. The court admitted the witness to testify, and the counsel for defendants excepted.

Such evidence was given by Killion; and *Young* and *Alexander* were examined, and testified that it was not usual in Philadelphia county to insert the name of the defendant in the execution in advertisements of sheriff's sales of personal property.

The cause being closed on both sides, the judge charged the jury, *inter alia,* as follows:—

"Personal property sold at a sheriff's sale may be left by the purchaser in the defendant's possession; but it is different in the case of a private sale. The sheriff's sale is a public sale made by the officer of the law. The defendants, however, in this action may *show* that the sale to McDermott was a fraudulent one, but they must show that he, the purchaser, was party to the fraud; not only that it was not fairly and properly conducted, but that the plaintiff was party to the fraud, for the sheriff's fraud alone in not giving proper notice will not affect the sale. The question is, was the plaintiff a participant in it? I have looked at the evidence, and must say that there is no evidence of any participation in it by the plaintiff. Mary Scantling is the only person who mentions him, and we have no evidence that he made use of any means to prevent the sale being known, or of his doing any act in relation to it. I see in her testimony no evidence of Mr. McDermott's knowledge of, or participation in, the alleged fraud; and your verdict should be for the plaintiff, for merely compensatory damages,

[McMichael *v.* McDermott.]

which are measured, in general, by the value of the property, and interest thereon from the time of taking."

To which portions of the said charge, the counsel for the said defendants excepted.

Verdict was rendered for the plaintiff.

It was assigned for error :—1. That the court below permitted the plaintiff to give in evidence the notice, dated February 21, 1845.

2. That the court below would not permit the defendants' counsel to give in evidence the several judgments of Leger, Mecke, Johnson, Yglesias, and others.

3. That the court below permitted John Killion to testify for the plaintiff, though he was interested, having made the sale upon which plaintiff claims the goods ; for taking which this action was brought against the sheriff, whose deputy he was, and to whom he had given bond for the faithful performance of his duty.

4. Because the court permitted the plaintiff's counsel to give by John Killion, Alexander, and Young, as rebutting, the testimony set forth in the fourth bill of exceptions.

5. That the court charged the jury that there was no evidence of any participation by the plaintiff in the fraud alleged to have been committed at the sheriff's sale ; and that the testimony of Mary Scantling contained no evidence of his knowledge of or participation therein ; and that their verdict should be for the plaintiff.

The case was argued by *Ingraham*, on part of plaintiff in error, as counsel of Quervelle.—He contended, *inter alia*, that the sale was collusive : 10 *Barr* 184 ; *Id.* 395 ; 11 *Wheaton* 199 ; 1 *Harris* 515 ; *Id.* 584. Also that the court should not have decided the question of fraud, but should have left it to the jury : 5 *Watts* 410 ; 6 *Barr* 250.

*Guillou*, for defendant, contended that the sheriff was a party to the fraud, if any existed in the case, and should not have been allowed to give testimony as to that part of the transaction. He alleged that there was no legal evidence of fraud in the case.

The opinion of the court was delivered February 9, by

COULTER, J.—The judge below instructed the jury that he saw no evidence of McDermott's knowledge of, or participation in the alleged fraud ; and that their verdict should be for the plaintiff. There was evidence quite sufficient to carry the case to the jury, to whom the judge ought to have submitted the question of actual fraud. There was no evidence of any advertisements of the time and place of sale having been put up by the sheriff's deputy, or any one else, no evidence whatever of notice ; and although it was

[McMichael *v.* McDermott.]

proved that the attorney of the plaintiff said, when applied to by the sheriff's officer, "sell, sell, sell, as quick as you can, make the money, show no favor or affection;" yet, when the sale was made, the plaintiff was present, and the only bidder; and, instead of making the money, permitted the property to remain in the hands and use of the defendant Laguerenne, who was his brother-in-law, just as it had been before. This, of itself, was no evidence of fraud, as the sale was made by the sheriff's officer under an execution. But it did not exclude actual fraud, and might be a circumstance connected with others to show its presence. It did not appear that any male person but the deputy sheriff and his clerk, and Mr. McDermott, were present at the sale; there were three or four females, one of whom was Miss McDermott, and the other a servant of the family; and it is altogether probable the others were members of the family. There was no bidder but Mr. McDermott, the plaintiff. Now, although McDermott did not tell the sheriff's officer to put up no advertisements or to make a secret sale; yet he saw that there were no bidders or bystanders there. Several of the neighbors were called, who testified that they had never heard of the sale; did not hear the sheriff's bell, although they lived within hearing distance. Under these circumstances, the plaintiff, who had the control of the sale, suffered it to go on, and was himself sole bidder and purchaser. There was room enough for the jury to have inferred that the plaintiff adopted, if he did not direct the measures of the officer. It is worthy of a passing remark, that the articles sold were such as are used by persons of rank. A carriage, and pair of horses, and set of harness, ottoman sofas, marble tables, mahogany chairs and tables, &c., &c.; many of the expensive articles having been procured on credit from Quervelle. It appears, also, that McDermott's judgment was confessed by Laguerenne, on the 11th September, 1844, and the sale was made on the 26th of the same month and year. Quervelle's judgment was obtained on the 24th December, 1844, on which judgment many of the same articles were sold, by due process regularly executed. McDermott then brought this action against the sheriff to recover damages for the sale at the suit of Quervelle. But the sale to McDermott was invalid, and passed to him no title. Not only the positive enactment, but the policy of the law, requires that a sheriff's sale of personal as well as real estate shall be published, by which I mean a sale upon due notice, as required by statute. The 42d section of the Act of 10th June, 1836, requires that before any sale of personal estate is made by the sheriff, he *shall* give notice, during at least six days, by six handbills, put up at the places best calculated to give the public notice. When, therefore, McDermott saw that there was no bidder there but himself, and no bystanders, it was his duty to inquire whether due notice had been given or not, or else he

chose to take all the risk of the position in which he voluntarily put himself. But the mere fact that there was no bidder but the plaintiff himself, and no bystanders, made the sale collusive and invalid. Under such circumstances, it was the duty not only of the officer, but of the plaintiff, to have the sale adjourned. For the principle that he who has the absolute control of the' sale for his own benefit cannot be a purchaser, is well established, unless .there is a fair competition of bidders, or a lawful opportunity given .for such competition; otherwise the property of the debtor might be sacrificed. And even the consent of the debtor would not cure the defect, for there is often collusion between him and a particular creditor. The other creditors have an interest which must · be protected. Thus it was ruled in 7 *Watts* 365, "That an agreement between an execution creditor and the debtor that personal property levied on should be sold on five days' notice by the sheriff was fraudulent and void against a subsequent execution, and that a sale under such circumstances to the execution creditor confers no title." But a much stronger case is to be found in 2 *Harris* 90. It is more precisely apposite to the case in hand. That was a sale by a constable of grain in the ground, where due notice had been given according to law. The constable went to the fields where the grain was growing, which was the place appointed for the sale ; the plaintiff having instructed him to bid a certain sum for him. The constable went into each field and made proclamation of the sale and bid, and no person appearing to bid more, went into the public road, which passed by the fields, and there proclaimed the sale and the bid, and knocked down the grain to the plaintiff. The court below instructed the jury that the sale was fraudulent and invalid. The *per curiam* opinion of this court is emphatic : " There can be no public sale without bidders or bystanders. If there was one bidder, and he not the execution creditor, or the controller of the sale, it might make a case of difficulty, because if the officer got a single bid, the property might be fairly struck down at its value, but not at a bid greatly below the value. In such case the officer ought to adjourn the sale; if he did not, the .inference of collusion between him and the bidder would be so .strong that the least spark of evidence would invalidate it. But the case is infinitely worse when the execution creditor is both buyer and seller. The presumption of collusion is then irresistible and conclusive." This strikes the case of the defendant in error with the deadly level of a rifle ball. I refer, in addition, to the authorities cited by the counsel for the plaintiff in error at bar. The court erred in withdrawing the cause from the jury.

The records of judgments obtained against Laguerenne by various persons, one of which was obtained before McDermott's, and all of them very soon thereafter, going to show the large indebt-·'edness of Laguerenne at the time he confessed judgment to his

[McMichael *v.* McDermott.]

brother-in-law, DcDermott, ought to have been admitted in evidence. Fraud can, in most cases, be made out only by a concatenation of circumstances, many of which, in themselves, amount to very little, but in connection with others make a strong case. There was the suddenness of the execution of McDermott, being on the same day that judgment was confessed, and the rapidity of the sale, and the connection of the parties, which seem to be connected with the indebtedness of Laguerenne at the time. Such evidence, in such cases, is always received, and is not impertinent or irrelevant.

Another ground is taken by defendant in error here, which was not taken by him in the court below; that is, that the sheriff cannot set up this defence of fraud or collusion, because he was a participant in it. The first observation I make on this position is, that if the court so declared the law, it would abet and carry out the fraud. But we are relieved from that necessity. It is not the sheriff who is concerned here, but the creditor of Laguerenne. The sheriff is but a man of straw, or rather a man impassible to wounds, who stands the thrusts of both parties. The plaintiff below, McDermott, called for the bond of indemnity from Quervelle to the sheriff, and the person who appeared for the sheriff produced it. By the very act, therefore, of McDermott, the sheriff is thrust aside, in order to let the attorney of Quervelle contest the fraud and collusion of the first sale; who accordingly did contest, as stated in the paper-book, as the sheriff did not refuse to make the levy on the goods in Laguerenne's possession, on Quervelle's execution. This is the only time and place where Quervelle can make good his right, and establish that the sale to McDermott was collusive. This is not the case of two individuals contracting where they are absolute to bind themselves, even in fraud, but who cannot, even in such case, shut out creditors. The sheriff is the agent of the law, and if he does wrong for one man he is bound to do right for another. Did these goods pass lawfully to McDermott by the first sale?

In Robbins *v.* Bellas, 2 *Watts* 357, it was held that a sheriff who sold land under a *venditioni exponas* is not thereby estopped from claiming the title as trustee of the person as whose property it was sold.

He was but the instrument of the law in making the sale. The rule that a man shall not set up his own turpitude, applies only to individuals having the right to control for themselves about their own property, and who shall not be permitted to set up their own fraud for their own advantage. That rule never *extended* to third persons so as to deprive them of their just rights; and never was so construed as to enable officers to defraud just creditors. We think the matters contested below remain unaffected by this principle.

Judgment reversed and *venire de novo* awarded.